UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

LORI CONRAD,                                    CIVIL NO. 07-151 (JRT/JSM)

      Plaintiff,

v.                                              **REPORT AND RECOMMENDATION**

MICHAEL J. ASTRUE,
Commissioner of Social Security,

      Defendant.

The above matter is before the undersigned United States Magistrate Judge on plaintiff's Motion for Summary Judgment [Docket No. 11] and defendant's Motion for Summary Judgment [Docket No. 14]. This matter has been referred to the undersigned Magistrate Judge for a Report and Recommendation by the District Court pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.1(c).

Defendant has denied Plaintiff Lori Conrad's application for disability insurance benefits (DIB) and Supplemental Security Income (SSI) under the Social Security Act, 42 U.S.C. § 423, 1381. Plaintiff filed a complaint seeking review of the denial of benefits on September 21, 2004. The action is now before the Court on cross-motions for summary judgment. Plaintiff is represented by Thomas S. Krause. Defendant is represented by Lonnie F. Bryan, Assistant United States Attorney.

For the reasons discussed below, it is recommended that plaintiff's Motion for Summary Judgment [Docket No. 11] be GRANTED in part and DENIED in part, defendant's Motion for Summary Judgment [Docket No. 14] be DENIED, and that the decision of the Administrative Law Judge be vacated and the case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

## I.      INTRODUCTION

On August 27, 2002, Conrad filed her application for disability insurance benefits

("DIB") and Social Security Income ("SSI"), alleging a disability onset date on November 22,

2000, due to blood clots in her right leg/thigh; problems with her right foot, ankle, toe, both

hands and tail bone. (Tr. 61-64, 203). At the administrative hearing, she also alleged

depression. (Tr. 607). She was last insured for DIB through March 31, 2006. (Tr. 65).

On June 21, 2006, Administrative Law Judge (ALJ) Michael Quayle issued a

decision finding Conrad not disabled because she can perform a significant number of

sedentary jobs in the national economy. (Tr. 26-27). On December 5, 2006, the Appeals

Council denied Conrad's request for review of the ALJ's decision, thereby making the ALJ's

decision the final decision of the Commissioner. (Tr. 10-12). See, 20 C.F.R. §§ 404.981,

416.1481.

## II.     PLAINTIFF'S BACKGROUND

Conrad was 36 years old on November 22, 2000, the date she alleged that she

became disabled. (Tr. 26). She has a high school education and past relevant work as a

school bus driver, emergency room clerk, and teacher's aide. (Tr. 25, 247).

## III.    MEDICAL RECORDS[1]

On July 22, 1998, Conrad underwent a right carpal tunnel release[2] and partial

---

[1]      Since Conrad does not challenge the ALJ's analysis of her mental condition, only the relevant medical evidence related to her physical condition will be summarized.

[2]      The medical definitions throughout were quoted from Plaintiff's brief, verified by *Stedman's Medical Dictionary*, 27th edition (2000), unless otherwise noted.  Carpal tunnel syndrome is a condition in which the median nerve is compressed as it passes through the carpal tunnel in the wrist, a narrow confined space.

tenosynovectomy.[3] (Tr. 335).

On November 17, 2000, Conrad saw her general practice physician, Sheri Lofton, M.D. with complaints of foot pain and swelling. (Tr. 500). Dr. Lofton referred her to a podiatrist with her clinic. (Tr. 500).

On November 22, 2000, Conrad saw podiatrist Richard Hansen, with complaints of right foot pain. (Tr. 499-500). Conrad reported that she was on her feet all day as a ward secretary for a local hospital. (Tr. 499). Upon examination, Dr. Hansen did not find any significant swelling, but assessed her symptoms as sesamoiditis,[4] possibly secondary to a stress fracture, and plantar fascial strain,[5] degenerative arthritis, and probably tendonitis. (Tr. 499). Dr. Hansen recommended anti-inflammatory medication and a cast so that she could be weight-bearing. (Tr. 499).

The cast was replaced on December 13, 2000, at which time Conrad was on crutches and unable to work. (Tr. 495).

On January 8, 2001, Dr. Hansen removed the cast. (Tr. 498). Conrad continued to report pain and discomfort underneath the ball of her foot in the sesamoid region. (Tr. 498). Dr. Hansen advised Conrad to begin weight bearing as tolerated and fitted her with an orthotic. (Tr. 498). He advised her to follow up with him in two weeks and that during this two-week period he would keep her off of work. (Tr. 496, 498).

---

[3]     Tenosynovectomy is defined as excision of a tendon sheath. *Stedman's Medical Dictionary*, 27th edition (2000).

[4]     Sesamoiditis is pain at the sesamoid bones beneath the base of the great toe with or without inflammation or fracture. A sesamoid is any of several round bones formed in a tendon where it passes over a joint.

[5]     A partial or complete tear in the fibrous connective tissue of the bottom of the foot.

On January 22, 2001, Dr. Hansen reviewed ankle x-rays taken that day, which were normal. (Tr. 497). Dr. Hansen noted marked swelling and color changes in the right foot and ankle. (Tr. 497). X-rays after the cast was removed showed the bone had not healed and revealed degenerative joint disease in the talonavicular joint.[6] Conrad remained off work. (Tr. 294).

As Conrad did not want a steroid injection, Dr. Hansen ordered a course of physical therapy and advised her that if therapy did not help, he would do a sesamoidectomy and resection of the degenerative area. (Tr. 294, 497). On February 5, 2001, her therapist noted that Conrad did not have any significant changes with physical therapy, noting that Conrad minimally participated in therapy due to being sick with bronchitis. (Tr. 290).

On February 5, 2001, Dr. Hansen saw Conrad for a follow-up. (Tr. 494). Conrad reported that physical therapy had not helped her condition. (Tr. 494). Dr. Hansen's assessment was that of a probable fractured tibial side sesamoid with inflammation and degenerative arthritis of the right talonovicular joint. (Tr. 494). Dr. Hansen recommended a sesamoidectomy to be performed to excise the tibial side sesamoid and remove the degenerative arthritic area of the talonovicular joint. (Tr. 494). Dr. Hansen performed the surgery later that month. (Tr. 251-52).

On March 12, 2001, Conrad saw Dr. Hansen for a post-op follow up. (Tr. 491). Dr. Hansen observed that Conrad was "doing really quite well." (Tr. 491). Upon exam, her foot was afebrile[7], with no signs of infection, and only some swelling. (Tr. 491). Dr. Hansen

---

[6]     Talonavicular is defined as relating to the talus and the navicular bone. *Stedman's Medical Dictionary*, 27th edition (2000).

[7]     Afebrile means without fever, denoting apyrexia; having a normal body temperature. *Stedman's Medical Dictionary*, 27th edition (2000).

advised Conrad that the swelling was probably consistent with her severe varicosity[8] problem. (Tr. 491). He removed the sutures and advised Conrad to continue non-weight bearing and icing for another two weeks. (Tr. 491).

On April 2, 2001, Conrad saw Dr. Hansen for another post-op follow up visit. (Tr. 490). Dr. Hansen again noted that Conrad was doing well. (Tr. 490). Dr. Hansen advised her to begin full weight bearing and gradually decrease her use of the crutches. (Tr. 490).  He advised her to follow up in three weeks and, at that time, he would determine if she needed any physical therapy and would also re-evaluate her for possible return to work. (Tr. 490). On April 23, 2001, she returned reporting that she was doing better, but was still having some swelling at the end of the day. (Tr. 490).  Dr. Hansen recommended physical therapy and use of a Jobst stocking for control of edema. (Tr. 490).

On April 30, 2001, Conrad began physical therapy . (Tr. 283). She advised her therapist that she was not working as she was laid off from her job as a clerical assistant in the emergency room . (Tr. 283). On May 11, 2001, upon discharge from physical therapy, the therapist noted that Conrad had some decrease in pain and swelling and was able to increase her tolerance of daily living activities. (Tr. 278). Conrad reported that she would get swelling later in the day. (Tr. 278).

On May 14, 2001, Dr. Hansen noted that Conrad did quite well with physical therapy, but that Conrad was reporting that she had "generalized discomfort," particularly when standing for long periods of time. (Tr. 489). She explained that she felt much better in the morning when initially rising. (Tr. 489). Upon exam, Dr. Hansen noted that Conrad was healing well, not exhibiting a great deal of tenderness or swelling over her problem areas.

---

[8]	Varicosity is defined as a varix or varicose condition. *Stedman's Medical Dictionary*, 27th edition (2000).

(Tr. 489). He advised Conrad to get fitted for compression stockings. (Tr. 489). Dr. Hansen also advised Conrad that she could return to work at this point; he indicated that she should look for a sedentary job, as he felt she could perform such a job. (Tr. 489). After Dr. Hansen advised Conrad to look for a sedentary job, she responded that she did not think employers would appreciate a 170 + pound woman elevating her foot while wearing professional attire. (Tr 489). She also indicated that she was only experienced as a school bus driver. (Tr. 489).

On July 17, 2001, Conrad saw Kim Fjelstad, DPM, for a second opinion . (Tr. 301). Dr. Fjelstad ordered an ankle MRI and gave Conrad cortisone and local anesthetic injections. (Tr. 300-01). On July 24, 2001, Conrad underwent an ankle MRI, which revealed no evidence of talocalcaneal tarsal condition and changes of mild plantar fascitis. (Tr. 303-04). Dr. Fjelstad stated that Conrad's recent surgery was not a success since she continued to have the same discomfort. (Tr. 300).

On August 14, 2001, Conrad sprained her right ankle. (Tr. 300). On September 5, 2001, x-rays of her right ankle showed a small avulsion fracture[9] involving the distal fibula. (Tr. 349).  She was advised that it should be treated conservatively with a cam walker.[10] (Tr. 349).

On October 15, 2001, Conrad saw pain specialist Dr. Christopher Wendell, for a right L3 lumbar sympathetic block[11] for treatment of her chronic right ankle pain. (Tr. 314). Conrad reported that she would have pain and swelling with prolonged periods of standing

---

[9]     An avulsion fracture is a tearing away or forcible separation.

[10]     This is also known as a walking boot.

[11]     An injection of an anesthetic to relieve pain resulting from abnormal activity of the sympathtic nervous system. The sympathetic nerves are part of the autonomic nervous system.

and improvement when she would take weight off her foot. (Tr. 314).

On November 9, 2001, Conrad saw Dr. Wendell's colleague, Stephen Wagner, M.D. (Tr. 311-12). Conrad reported that her pain improved for several weeks and then returned to baseline with minimal lasting benefit . (Tr. 311).  Dr. Wagner was unable to determine why she had pain in the posterior aspect of her ankle. (Tr. 311).  Dr. Wagner stated that Conrad was quite active and felt that the swelling in her ankles was activity related. (Tr. 311).  She reported that she was able to walk and even dance with just occasional swelling at the end of the day. (Tr. 311).  Dr. Wagner administered another right lumbar sympathtic block and right foot injections. (Tr. 308, 311).

On December 19, 2001, Dr. Wagner again indicated that Conrad's right ankle pain was of "elusive etiology." (Tr. 307).  He administered another lumbar sympathetic block for her right ankle pain. (Tr. 307).  Dr. Wagner also notice a new onset of bilateral lower leg swelling. (Tr. 307).  Dr. Wagner referred Conrad to see Dr. Lofton for a consultation regarding her swelling and gave her a prescription for Neurontin. (Tr. 307).

On December 27, 2001, Conrad saw Dr. Lofton for an office visit. (Tr. 486). Dr. Lofton observed pitting edema[12] bilaterally up to Conrad's knees. (Tr. 486). She recommended bilateral ultrasound testing and strongly encouraged Conrad to quit smoking. (Tr. 486).  The testing revealed no evidence of an acute deep venous thrombosis (DVT).[13] (Tr. 511).

---

[12]     Edema is swelling from fluid accumulation in certain body tissues. The swelling is the result of the accumulation of excess fluid under the skin in the spaces within the tissues that are outside of the blood vessels.

[13]     DVT is a blood clot that forms in a vein deep in the body.

Dr. Lofton referred Conrad for physical therapy . (Tr. 319-20). On May 7, 2002, the physical therapist noted that her two-month goal was for Conrad to return to full-time work at a job where she did not have to be on her feet 50% of the day. (Tr. 320).  Conrad stated that physical therapy did not provide significant changes in her pain level, but the therapist's objective examination findings noted only mild swelling. (Tr. 319).

On May 6, 2002, Conrad stated to Dr. Hansen that she had no improvement with physical therapy. (Tr. 484).  When Dr. Hansen explained that he had not received any follow-up information from physical therapy, Conrad stated that they said there was no changes and that they do not send out reports. (Tr. 484).  Dr. Hansen noted this explanation to be "questionable." (Tr. 484).  Upon examination, he did not find anything significantly wrong to warrant the types of complaints she was reporting. (Tr. 484).  For example, while she reported significant swelling, he did not find significant swelling of the right foot and ankle. (Tr. 484).  Dr. Hansen indicated that he would seek another opinion from neurology, but noted that he was suspicious because Conrad was currently going through divorce proceedings and questioned whether there was some lingering on her part regarding these current issues. (Tr. 484).

On February 12, 2003, Conrad saw Dr. Park with complaints of left hand numbness and tingling. (Tr. 347).  She denied any significant weakness of the left hand. (Tr. 347). She also stated that she had good results with her previous carpal tunnel release of the right hand, with no more numbness, tingling or pain on the right hand. (Tr. 347). Upon examination, Dr. Park found that Conrad had mildly positive Tinel's[14] and Phalen's[15] signs

---

[14]     A tingling sensation in the distribution of a damaged nerve which occurs when the nerve is lightly tapped.

[15]     A maneuver done to check for carpal tunnel abnormality.

of her left wrist. (Tr. 347).  Dr. Park concluded Conrad had carpal tunnel on the left side with median nerve impingement. (Tr. 347).  He recommended a carpal tunnel release on the left side and advised Conrad to call when she wanted surgery done. (Tr. 347).

On March 26, 2003, Dr. Park performed a carpal tunnel release and a partial tensosynvectomy of Conrad's left hand. (Tr. 321). In April 2003, Conrad stated that her severe pre-op pain and numbness had improved. (Tr. 345).  Dr. Park advised Conrad to use a wrist brace and to do no heavy grasping for six weeks. (Tr. 345).

On May 9, 2003, Conrad saw Michael D. Castro for an evaluation of her right foot pain, at the referral of Dr. Lofton. (Tr. 323-24, 477). Conrad stated that her pain was proportional to her weight-bearing and that it only improved with rest and elevation of her foot. (Tr. 323). She also indicated that it definitely affected her ability to work. (Tr. 323).  Dr. Castro noted gross edema to the foot, ankle and leg, as well as a dusky discoloration. X-rays showed global osteopenia[16] to the right foot. (Tr. 323). There was some early evidence of sclerotic[17] changes and osteophytes[18] formation to the joints of the midfoot. After examining Conrad, Dr. Castro indicated that he did not find anything which could explain Conrad's reported discomfort. (Tr. 324).  He recommended physical therapy for her complaints of global discomfort and weakness. (Tr. 324).  Dr. Castro believed that the claimant's pain lead to changes in her gait, which in turn resulted in pain and swelling. (Tr. 324). He also believed that the pain and swelling could be related to venous

---

[16]     Osteopenia is defined as decreased calcification or density of bone. *Stedman's Medical Dictionary*, 27th edition (2000).

[17]     Sclerosis is a hardening of tissue due to inflammation of disease.

[18]     Osteophyte is defined as a bony outgrowth or protuberance. *Stedman's Medical Dictionary*, 27th edition (2000).

incompetency. (Tr. 324). He also recommended she wear TED hose[19] and continue wearing her orthotics. (Tr. 324).

On September 23, 2003, Conrad advised Dr. Lofton that she continued to have tingling symptoms in her feet at night. (Tr. 475). She also stated that after working, her ankles would swell . (Tr. 475).  Dr. Lofton referred Conrad to see a neurologist. (Tr. 475).

On October 3, 2003, Conrad saw neurologist Neil Dahlquist, M.D. for a consultation regarding Conrad's leg complaints. (Tr. 328-29). She stated that the February 2001 foot surgery did help some of her complaints, but that she had swelling afterwards. (Tr. 328). She also indicated that a Jobst stocking did not help her symptoms. (Tr. 328). Upon examination, Dr. Dahlquist found significant varicosities in her right leg with some ankle swelling, but otherwise her gait, station, cerebellar testing, muscle stretch reflexes, plantar stimulation, strength, cranial nerve examination, superficial and cortical sensory testing were all unremarkable except for decreased sensation to pinprick around the scar on her foot. (Tr. 329).  Dr. Dahlquist also indicated that she had a fairly good range of motion of her back with negative straight leg raising. (Tr. 329).  Dr. Dahlquist's impression was that Conrad had possible restless leg syndrome and varicosities with leg swelling. (Tr. 329). He recommended that Conrad see a specialist in varicosities and prescribed Maripex for her restless leg complaints . (Tr. 329).   He also strongly urged Conrad to wear good support stockings and discussed with her trying to elevate her leg above her heart at least two to three times a day to see if this would help with some of her chronic edema. (Tr. 329).

---

[19]     TED hose stockings are long, tight fitting sock that keep mild pressure on the legs to prevent blood from clotting.

On October 16, 2003, Conrad underwent a venous duplex ultrasound to assess her right lower leg swelling . (Tr. 508). The results indicated that Conrad's veins in her right lower leg were normal. (Tr. 508).

On May 19, 2004, Conrad saw Dr. Mikhail, another physician who worked with Dr. Lofton. (Tr. 469-70). Conrad complained of a persistently swollen right leg. (Tr. 469). Dr. Mikhail observed that Conrad had large varicose veins that were moderately tender. (Tr. 469). She reported that she was on her feet most of the day and that the pain and discomfort had caused her to stop driving her bus. (Tr. 469). She reported that she now worked for an apartment complex. (Tr. 469). Dr. Mikhail noted that Conrad had some dependent edema with a palpable large saphenous vein. (Tr. 469-70). Dr. Mikhail stated that he would consult with radiologists for further evaluation. (Tr. 470).

On July 23, 2004, Conrad reported to Dr. Lofton that she was hit in the face by a car door. (Tr. 468). She also reported that she had a bump near her tailbone for a month. (Tr. 468). Dr. Lofton recommended no treatment except to return for her regular physical examination. (Tr. 468).

On August 6, 2004, Conrad had an ultrasound of her right lower leg. (Tr. 505). It revealed deep venous thrombosis (DVT) in the right superficial femoral vein, which was consistent with either a chronic DVT or an old thrombus. (Tr. 505). On August 11, 2004, Dr. Lofton reviewed the ultrasound results and indicated that Conrad had both new and old clots, both arterial and venous. (Tr. 467). Conrad requested a second opinion before beginning any treatment, and asked for a referral to the Mayo Clinic. (Tr. 467). Dr. Lofton strongly advised Conrad to quit smoking . (Tr. 467). On August 12, 2004, an ankle/ brachial index study was performed on Conrad. (Tr. 504). It revealed normal results after exercise. (Tr. 504).

On August 17, 2004, Conrad saw Dr. Delaune for a consultation regarding DVT, at the referral of Dr. Lofton. (Tr. 339-40). Dr. Delaune reviewed Conrad's most recent ultrasound results which showed a chronic DVT in the right superficial femoral vein. (Tr. 339, 505).  Dr. Delaune noted that Conrad appeared to have chronic DVT and now postphlebitic syndrome which would appear to be a chronic problem and would be difficult to improve, at least from this standpoint. (Tr. 340).  Dr. Delaune recommended that Conrad see a vascular surgeon or an interventional radiologist to see if her veins could be improved. (Tr. 340).  Dr. Delaune also recommended that Conrad wear a heavy tight wrap around the leg to prevent swelling. (Tr. 340).

On August 18, 2004, Conrad was measured and fitted with Jobst stockings and orthotic inserts . (Tr. 341). Conrad reported that she felt very comfortable wearing the stockings. (Tr. 341). Conrad also saw Dr. Lofton on August 18, 2004. (Tr. 464-65). Dr. Lofton drafted an office note on that day which stated:

> There are multiple fine varicosities noted on the inner aspect of her right foot compared to her left and she has large superficial varicosities noted on her right leg, not noted on her left. Her tailbone is palpated and it is tender to the distal edge. There is no skin breakdown noted. Her hands are examined. There are bony enlargements of the PIP joints. There is no tenderness to palpation. She does have limited flexion on the right hand compared to the left.
> . . .
> Her main concern is the pain that she experiences, right foot pain, upper thigh pain and ankle pain. There is swelling, soreness and painful to be upright. . . .She has tailbone pain that is severe, very difficult to sit.
> . . .
> She also notes that her fingers are achy and swollen, particularly in the knuckles of both hands with the right hand being more swollen than the left.

(Tr. 464, 465).  Dr. Lofton discussed occupational therapy as a treatment option. (Tr. 464).

On September 8, 2004, Conrad went to the Mayo Clinic for an evaluation. (Tr. 388-91). Dr. Raymond Shields advised Conrad that she had chronic DVT in her right femoral vein. (Tr. 388). Dr. Shields recommended anti-coagulation therapy, but Conrad declined the therapy. (Tr. 388). Dr. Shields also recommended use of a compression stocking, but Conrad stated that she had difficulty putting on the hosiery due to upper extremity joint stiffness and hand swelling . (Tr. 388). She also stated she had difficulty negotiating door knobs. (Tr. 388). Regarding Conrad's right foot complaints, Dr. Shields indicated that her complaints were not secondary to DVT. (Tr. 388). He recommended further evaluation with Physical Medicine and Rehabilitation and a rhumatology evaluation at the Mayo Clinic in October 2004. (Tr. 388-89).

On September 15, 2004, Conrad saw Dr. William Park of Summit Orthopedics regarding her foot pain . (Tr. 343). After examining Conrad, Dr. Park stated that she was not a candidate for any surgical procedure as there were no objective findings of an arthritis type condition. (Tr. 343-44). He recommended conservative treatment, including arch support and range of motion exercises. (Tr. 344).

On September 17, 2004, Conrad saw Dr. Lofton with complaints of hand pain. (Tr. 461). Dr. Lofton referred Conrad to see Dr. Gary Baker, another doctor at Dr. Lofton's clinic, for a rheumatologic evaluation for Conrad's complaints of foot, leg and joint pain. (Tr. 422, 461). On September 17, 2004, Conrad saw Dr. Baker. (Tr. 422). She reported that she had pain in her tailbone and that she had pain sitting or getting up. (Tr. 422). She also reported stiff, sore, and achy feeling in her hands from her forearms to the fingertips. (Tr. 422). She indicated that she was supposed to wear compression stockings, but could not get them on or off due to stiff and sore hands. (Tr. 422). Dr. Baker noted Conrad's

positive ANA[20] results. (Tr. 422).  Upon examination, Dr. Baker found Conrad's right leg to be slightly more swollen that the left with some varicosities and venostasis-type changes.[21] (Tr. 423).  Dr. Baker opined that Conrad's diffuse arthralgias involving her hands and wrists were associated with the positive ANA results. (Tr. 422).  He also noted that she had a much more chronic problem with pain in her left foot with apparent venous thrombosis. (Tr. 423). He felt the tailbone pain was not likely related to the positive ANA test, but that it may have something to do with her 65 pound weight loss. (Tr. 423).  Dr. Baker prescribed Plaquenil and recommended additional laboratory tests. (Tr. 423-24).

On October 13, 2004, Conrad returned to the Mayo Clinic. (Tr. 354-59). X-rays revealed hypertrophic changes throughout the spine, degenerative disc disease and degenerative arthritis in the lower lumbar facet joints. (Tr. 367).  Conrad complained of a pain inside her foot and in her tailbone. (Tr. 354). She also had pain in her hand. (Tr. 354). Dr. Terry Oh observed that Conrad had tenderness over her gluteal region, but no significant tenderness of her tailbone. (Tr. 359).  While she had tenderness of her proximal interphalangeal (PIP)[22] joints of both hands, she had no synovitis of her metacarpal phalangeal[23] joints or her wrists. (Tr. 359).  Tinel's testing was negative. (Tr. 359).  Her overall joint range of motion was full and pain free. (Tr. 359). Dr. Oh recommended physical therapy while awaiting other test results. (Tr. 360).  Dr. Oh diagnosed Conrad with right foot

---

[20]     These antibodies, produced by 'B' lymphocytes or B cells, attack normal tissues in the body, such as muscle or connective tissue.

[21]     A piling up of bone at the site of a new or repeat injury.

[22]     Interphalangeal articulations of the hand are hinge-joints of the phalanges of the hand. "Proximal interphalangeal joints" (PIP) are those joints between the first and second phalanges.

[23]     The knuckle joints in the fingers between the long bones in the hand and the smaller bones in the fingers are called metacarpophalangeal joints or MP joints.

and leg pain, pain in her hands, patellofemoral pain, carpal tunnel symptoms, pelvic floor pain, chronic right lower extremity deep vein thrombosis, chronic right leg swelling and chronic sleep disturbance. (Tr. 359).

Dr. Tompkins at the Mayo Clinic also conducted a consult exam on October 13, 2004. He stated that he did not see evidence of inflammatory arthritis, but thought she might have some osteoarthritis in the PIP joints. (Tr. 356). He also stated that her lumbar spine showed degenerative disc disease and she had deep vein thrombosis. (Tr. 356).

On November 2, 2004, Conrad saw Dr. Mikhail. (Tr. 454). Dr. Mikhail noted that Conrad was unable to pull her Jobst stockings up in order to avoid the chronic swelling from the postphlebitic syndrome. (Tr. 457). He observed her hands demonstrated severe osteoarthritic changes. (Tr. 457). He concluded that Conrad had moderate to severe osteoarthritis, probably rheumatoid arthritis, with depressive symptoms and attention deficit disorder. (Tr. 457).

On November 3, 2004, Conrad saw Dr. Beckley at the Mayo Clinic regarding her foot and leg pain. (Tr. 384). Upon examination, Dr. Beckley found that Conrad had a distinct enlargement of her right foot, calf, and thigh compared to the left. (Tr. 384). He also observed that her midfoot motion was somewhat restricted and there was diminished sensation and tingling over the toes on her right foot. (Tr. 384). Dr. Beckley opined that Conrad's foot situation was stabilized. (Tr. 385). He recommended a shoe with a rigid, stiff sole to take a considerable load off her metatarsalphalangeal joints, wearing a below-the-knee stocking all day until she would put up her foot in bed, and participating in an exercise program. (Tr. 385).

On November 4, 2004, Conrad saw Dr. Russell Gelfman at the Mayo Clinic to evaluate her coccyx pain. (Tr. 382-83). Upon examination, he observed some give way

with strength testing. (Tr. 382).  He also observed that Conrad did not have any tenderness with palpation over the tip of the coccyx, but she did have tenderness in the upper gluteal fold along the dorsum of the coccyx. (Tr. 382).  Dr. Gelfman indicated that the location of her reported pain was atypical and was at a loss to explain the symptoms. (Tr. 382).  Given her complaints of such severe pain, Dr. Gelfman ordered an MRI of her pelvis since x-rays of her coccyx were unremarkable. (Tr. 382).  While waiting for the pelvis MRI results, Dr. Gelfman indicated that Conrad would benefit from a coccygeal cutout cushion. (Tr. 382).  Conrad's pelvic MRI results were normal, except for post-operative changes related to her hysterectomy. (Tr. 378).  Dr. Gelfman again recommended that Conrad use a sacral cut-out cushion at all times. (Tr. 378).

On November 4, 2004, Conrad saw rheumatologist Dr. Ytterberg at the Mayo Clinic for an evaluation of her hand pain. (Tr. 379-80).  Dr. Ytterberg found Conrad to have minimal hypertrophic changes with no synovitis. (Tr. 379).  X-rays of her hands and wrists were negative. (Tr. 379).  Dr. Ytterberg stated that he did not have a clear cause for the hand symptoms. (Tr. 379). He felt the hand symptoms might represent some early degenerative arthritis, but it did not show up on x-rays. (Tr. 379).  He noted that the ANA tests were positive, but there was nothing else to make a diagnosis of lupus or a specific connective tissue disease. (Tr. 379).  Dr. Ytterberg recommended continued conservative treatment, non-steroidal anti-inflammatory drugs . (Tr. 379).

On January 11, 2005, Conrad saw Dr. Lofton for a follow-up visit. (Tr. 451). Dr. Lofton examined Conrad's right leg, noting that it was "slightly swollen" with no tenderness. (Tr. 451).  Conrad made no complaints of tailbone pain. (Tr. 451).  Dr. Lofton asked Dr. Badroos to evaluate Conrad for purposes of her disability application. (Tr. 447).

On January 12, 2005, Conrad saw Dr. Badroos for a consultative examination. (Tr. 447-50).  Conrad's main complaints were her right leg swelling, chronic right foot pain, and recent arthritic changes in both hands. (Tr. 448).  Conrad did not make any complaints related to her tailbone. (Tr. 448).  Dr. Badroos found some point tenderness on palpation of the paracervical muscles and along the mid portion of the trapezius muscle. (Tr. 448). Conrad also showed mild lumbosacral tenderness on her lumbar spine exam. (Tr. 448-49). In conducting a hand exam, Dr. Bardross noted that Conrad had  enlargement of the PIP joints, but no deformity of the metatarsophalangeal joints. (Tr. 449).   His overall assessment was bilateral hand pain and stiffness with probable rheumatoid arthritis, chronic cervical spine pain, chronic lumbar spine pain with degenerative disk disease, coccydynia, chronic right foot pain and chronic deep venous thrombisis of the right leg. (Tr. 449).  Dr. Badroos indicated that, from a physical standpoint, Conrad could return to work where she would perform light seated work, with frequent allowances for stretching her positions, to avoid any prolonged sitting . (Tr. 449).  He also opined that she should not lift or push more than 5-10 pounds, and should perform work which did not require any prolonged standing or walking . (Tr. 449).

On June 8, 2005, Conrad saw Dr. Lofton for a routine physical examination . (Tr. 439).  She also reported tailbone pain, but indicated that a donut helped for sitting . (Tr. 439).  On July 29, 2005, Dr. Lofton completed a medical assessment form regarding Conrad's physical ability to perform work-related activities. (Tr. 431-33). Dr. Lofton indicated that Conrad could lift only light weight, could stand and/or walk less than one hour during an eight-hour workday, and had a very minimal ability to sit either without interruption or in general during a workday. (Tr. 432).  Dr. Lofton also opined that Conrad could never climb, balance, stoop, crouch, kneel or crawl. (Tr. 432).  Dr. Lofton  made the following medical

findings to support her assessment of an impairment with respect to lifting and carrying:

> chronic cervical and lumbar pain, tenderness to touch, bilateral upper extremity pain – patient notes weakness, pain & limited use – Right lower extremity– h/o DVT, chronic phlebites; Lori has poor circulation resulting in chronic pain, numbness & swelling.

(Tr. 431).  With respect to her assessment of impairment on Conrad's ability to stand and walk, Dr. Lofton referred to her comments regarding the right lower extremity, neck and back, and to "calf spasms with prolonged walking or standing." (Tr. 431).  Regarding the impairment to Conrad's ability to sit, Dr. Lofton stated that her history of "chronic phlebites limits sitting; most notable is patient's tailbone pain which is chronic & constant & mainly affects, sitting , but also standing, walking and lifting." (Tr. 432).  Dr. Lofton indicated that Conrad could never perform such postural activities as climbing, balancing, stooping, crouching, kneeling or crawling because they would aggravate her chronic phlebites and arthritis. (Tr. 432).   As to Conrad's ability to reach, handle, feel  and push and pull, Dr. Lofton stated that these functions were impaired by the pain, weakness and numbness in her hands, and again referred to the issues Conrad had with tailbone pain, chronic phlebites in her right leg, and chronic neck and back pain and tenderness. (Tr. 432). Dr. Lofton also stated that the rheumatology report and enlarged PIP joints in Conrad's hands supported her assessment.  (Tr. 432).

In December 2005, Conrad dropped a piece of heavy furniture on her right toe, causing a non-displaced fracture of the toe . (Tr. 549, 553).  Dr. Mikhail advised Conrad that she be placed on a post-operative boot for treatment of the fracture . (Tr. 549).  Conrad made no other complaints regarding her physical condition through the date of the ALJ's decision in June 2006. (Tr. 549).

## IV.    PROCESS FOR REVIEW

### A.   Administrative Process

Conrad filed applications for a period of disability and disability insurance benefits and supplemental security income on September 21, 2004. (Tr.18).   Conrad alleged disability beginning November 22, 2000. The application was denied initially on January 5, 2005 and upon reconsideration on April 21, 2005. (Tr. 18).   On May 2, 2005, Conrad requested a hearing before an Administrative Law Judge. (Tr. 18).   A hearing was held before Administrative Law Judge Michael Quayle on June 8, 2006. (Tr. 18).   On June 21, 2006, the ALJ issued an unfavorable decision. (Tr. 27).   The Social Security Administration Appeals Council denied a request for further review by notice dated December 5, 2006. (Tr. 10).   The denial of review made the ALJ's findings the final decision of the defendant.   42 U.S.C. §405(g); Browning v. Sullivan, 958 F.2d 817, 822 (8th Cir. 1992); 20 C.F.R. § 404.981.

### B.   Hearing Before the Administrative Law Judge

Kenneth Ogren appeared as the vocational expert ("VE") at the hearing. He submitted a summary of Conrad's past relevant work. (Tr. 611-12, 247). Given Conrad's residual functional capacity as found by the ALJ, Ogren testified Conrad could not return to her past work as school bus driver and emergency room clerk. (Tr. 26, 614).   He further testified that she could perform other work such as polisher, inspector/cuff folder and sorter. (Tr. 614).

### C.   Framework for Evaluation of Disability

"The Social Security program provides benefits to people who are aged, blind, or who suffer from a physical or mental disability."   42 U.S.C. § 1382(a); Locher v. Sullivan, 968 F.2d 725, 727 (8th Cir. 1992).   Disability means that the claimant is unable to work by reason of "medically determinable" physical or mental impairment or impairments.

42 U.S.C. §1382c(a)(3)(A).  The impairment must be so severe that the plaintiff not only cannot do the work he or she did before, but also cannot do any other kind of substantial gainful work.  42 U.S.C. §1382c(a)(3)(A).  The impairment must last for 12 months or be expected to result in death.  42 U.S.C. § 1382c(a)(3)(A).

With respect to the claim for a period of disability and disability insurance benefits, there is an additional issue whether the insured status requirements of the Social Security Act are met. Section 216(i) and 223. Conrad was insured through March 31, 2006, thus she must establish disability on or before that date in order to be entitled to a period of disability and disability insurance benefits.

### D.   Administrative Law Judge Hearing's Five-Step Analysis

If a claimant's initial application for benefits is denied, he or she may request reconsideration of the decision.  20 C.F.R. §§ 404.909(a)(1), 416.1409(a).  A claimant who is dissatisfied with the reconsidered decision may obtain administrative review by an ALJ. 42 U.S.C. §§ 405(b)(1), 1383(c)(1); 20 C.F.R. §§ 404.929., 416.1429, 422.201 et seq.  To determine the existence and extent of a claimant's disability, the ALJ must follow a five-step sequential analysis, requiring the ALJ to make a series of factual findings regarding the claimant's work history, impairment, residual functional capacity, past work, age, education, and work experience.  See 20 C.F.R. §§ 404.1520, 416.920; see also Locher, 968 F.2d at 727.  The Eighth Circuit described this five-step process in Morse v. Shalala, 16 F.3d 865, 871 (8th Cir. 1994)(citing 20 C.F.R. § 416.920), vacated on other grounds, as follows:

> The first step asks if the claimant is currently engaged in substantial gainful employment.  If so, the claimant is not disabled.  If not, the second step inquires if the claimant has an impairment or combination of impairments that significantly limits the ability to do basic work activities.  If not, the claimant is not disabled.  If so, the third step is whether the impairments meet or equal a listed impairment; if they do, the claimant is

disabled.  The fourth step asks if the claimant's impairments prevent her from doing past relevant work.  If the claimant can perform past relevant work, she is not disabled.  The fifth step involves the question of whether the claimant's impairments prevent her from doing other work.  If so, the claimant is disabled.

### E.   Appeals Council Review

If a claimant is dissatisfied with the ALJ's decision, he or she may request review by the Appeals Council, though review is not automatic.  20 C.F.R. §§ 404.967-404.982, 416.1467-416.1482.  The decision of the Appeals Council, or of the ALJ if the request for review is denied, is final and binding upon a claimant unless the matter is appealed to Federal District Court within 60 days of notice of the Appeals Council's action. 42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. §§ 404.981, 416.1481.

### F.   Judicial Review

Judicial review of the ALJ's decision generally proceeds by considering the decision of the ALJ at each of the five steps.  The Court is required to review the administrative record as a whole and consider:

1.   The credibility findings made by the ALJ.

2.   The plaintiff's vocational factors.

3.   The medical evidence from treating and consulting physicians.

4.   The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.   Any corroboration by third parties of plaintiff's impairments.

6.   The testimony of vocational experts, when required, which is based upon a proper hypothetical question which sets forth plaintiff's impairments.

Cruse v. Bowen, 867 F.2d 1183, 1185 (8th Cir. 1989) (*citing* Brand v. Secretary of HEW, 623 F.2d 523, 527 (8th Cir. 1980)).

The review by this Court is limited to a determination of whether the decision of the ALJ is supported by substantial evidence on the record as a whole.  42 U.S.C. § 405(g); Johnson v. Apfel, 210 F.3d 870, 874 (8th Cir. 2000); Clark v. Chater, 75 F.3d 414, 416 (8th Cir. 1996); Murphy v. Sullivan, 953 F.2d 383, 384 (8th Cir. 1992).  "We may reverse and remand findings of the Commissioner only when such findings are not supported by substantial evidence on the record as a whole."  Buckner v. Apfel, 213 F.3d 1006, 1012 (8th Cir. 2000).

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison v. NLRB, 305 U.S. 197, 229 (1938)); see also Culbertson v. Shalala, 30 F.3d 934, 939 (8th Cir. 1994).  "Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion." Buckner, 213 F.3d at 1012 (quoting Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000)); see also Cox v. Apfel, 160 F.3d 1203, 1206-07 (8th Cir. 1998).

In reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ.  Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993).  "It is not my job to decide the facts anew, reweigh the evidence, or substitute my judgment for that of the Commissioner.  In this regard, I 'must consider both evidence that supports and evidence that detracts from the Secretary's decision, but may not reverse merely because substantial evidence exists for the opposite decision.'" Callison v. Callahan, 985 F. Supp. 1182, 1186 (D. Neb. 1997) (citations omitted).

The possibility that the Court could draw two inconsistent conclusions from the same record does not prevent a particular finding from being supported by substantial evidence. Culbertson, 30 F.3d at 939.  The Court should not reverse the Commissioner's finding merely because evidence may exist to support the opposite conclusion.  INS v. Elias-Zacarias, 502 U.S. 478, 481 n. 1 (1992); Buckner, 213 F.3d at 1011; Mitchell v. Shalala, 25 F.3d 712, 714 (8th Cir. 1994).  Instead, the Court must consider "the weight of the evidence in the record and apply a balancing test to evidence which is contradictory." Gavin v. Apfel, 811 F.2d 1195, 1199 (8th Cir. 1987).

A claimant bears the burden of proving his or her entitlement to disability insurance benefits under the Social Security Act.  See 20 C.F.R. §§ 404.1512(a), 416.912(a); Thomas v. Sullivan, 928 F.2d 255, 260 (8th Cir. 1991).  Once a claimant has demonstrated that he or she cannot perform prior work due to a disability, the burden of proof shifts to the Commissioner to show that the claimant can engage in some other substantial, gainful activity.  Martonik v. Heckler, 773 F.2d 236, 238 (8th Cir. 1985).

**G.**     **The ALJ's Decision**.

The ALJ followed the five-step sequential evaluation process for determining whether an individual is disabled under 20 C.F.R.§404.1520(a) and 416.920(a).

At step one, the ALJ found that Conrad met the status requirements of the Social Security Act through March 31, 2006. (Tr. 20).  The ALJ found that Conrad has not engaged in substantial gainful activity at any time relevant to this decision. 20 C.F.R. §404.1520(b). (Tr. 20).

At the second step, the ALJ found that Conrad has the following severe impairments:  bilateral carpal tunnel releases;  sesamoid fracture, status post sesamoidectomy and ostectomy of the talonavicular joint of the right foot with osteopenia;

a history of thrombosis; varicosities; status post avulsion fracture of the distal fibula; degenerative disc disease of the lumbar spine; status post fracture of the right great toe; major depressive disorder; and anxiety disorder NOS. 20   C.F.R. §404.1520(c) and 416.920(c). (Tr. 20). The ALJ then considered what limitations arose from claimant's mental impairment.  The ALJ concluded that Conrad's impairments result in more than minimal limitations on the performance of basic work activities. (Tr. 20).

At the third step in the evaluation process, the ALJ found Conrad did not have an impairment that meets or equals an impairment listed in Appendix 1.  (Tr. 21).

Step four requires that the ALJ first determine Conrad's residual functional capacity ("RFC") and then consider whether she can still do work she has done in the past. 20 C.F.R. § 404.1520(e).  Determination of the RFC requires consideration of the evidence taken as a whole, including not only objective medical evidence, but also the subjective complaints expressed by the claimant.  Polaski v. Heckler, 739 F.2d 1320, 1321-1322 (8th Cir. 1984).  In evaluating those subjective complaints, the ALJ must consider the objective medical evidence or its absence, along with prior work record and observations by third parties and treating and examining physicians.  Id. at 1322.

The ALJ found that Conrad has the residual functional capacity to lift and carry 10 pounds occasionally, stand and/or walk two hours of an eight-hour day, sit six hours of an eight-hour day and limited to unskilled work with low stress and routine tasks.  (Tr. 21).

In making this determination, the ALJ found that Conrad's medically determinable impairments could reasonably be expected to produce the alleged symptoms, but that Conrad's statements concerning the intensity, duration and limiting effects of these symptoms were not entirely credible.  (Tr. 22). The ALJ further stated that "Conrad's allegations of disabling pain and incapacitating limitations were not consistent with or

supported by the objective medical record of treating and examining physicians." (Tr. 22).

In reaching the conclusions as to Conrad's residual functional capacity, the ALJ stated that he considered all medical opinions. The ALJ did not place controlling weight on the opinion of Conrad's treating physician, Dr. Lofton, because "the record does not clearly support a residual functional capacity less than the sedentary level." (Tr. 25). In reaching this conclusion, the ALJ stated:

> The claimant has been fully evaluated by a number of specialists. A consensus of specialists finds no significant findings to support the level of chronicity and severity of the claimant's complaints. The claimant is maintained on conservative care and she has made progress with physical functioning.

(Tr. 25).

Under the fourth step of the evaluation, the ALJ determined that Conrad is unable to do her past relevant work as a school bus driver and emergency room clerk. (Tr. 26). 20 C.F.R. §404.1520(e). Thus, the ALJ proceeded to the fifth step.

The final step of the evaluation is to determine whether a claimant can do other work given her residual functional capacity assessment and considering her age, education and past work experience. 20 C.F.R. §404.1520(f). Conrad was 36 years old on the alleged disability onset date and has at least a high school education. (Tr. 26). Considering her age, education, work experience and RFC, the ALJ found she could perform other work which exists in significant numbers in the national economy such as sorter, inspector and plastic polisher. (Tr. 26).

## V.  DISCUSSION

Conrad contends the ALJ erred in his evaluation in two respects. First, she maintains that the ALJ applied the wrong legal standard in assessing the opinions of her

treating physician, Dr. Lofton, and in doing so, failed to give proper weight to Dr. Lofton's opinions, and instead substituted his own lay opinion for Dr. Lofton's opinion.  See Pl.s' Mem., pp. 18-22.  Second, Conrad argues that the ALJ failed to make a comprehensive, individualized assessment of her RFC by failing to impose any limitation on the use of her hand or her need to elevate her swollen leg.  Id., pp. 22-30.  Conrad urges the Court to reverse the final agency decision, enter judgment in her favor, and remand the matter for calculation and payment of benefits, or alternatively, reverse the ALJ's decision and remand the matter for further proceedings, including the proper consideration of Dr. Lofton's opinions, a function-by-function assessment of Conrad's RFC (including the use of her hands and need for her to elevate her leg), and the vocational expert testimony regarding the availability of other work in light of Conrad's reformulated RFC.  Id., pp. 32-33.

Defendant, on the other hand, argues that summary judgment should be entered in his favor on grounds that the ALJ properly relied on the medical source opinions and posed a complete and proper hypothetical question to the ALJ.

### A.   Medical Opinions

Conrad had been treating with Dr. Lofton since November 2000.  Dr. Lofton had seen Conrad on numerous occasions and from 2000 through 2005 had referred Conrad to other specialists for consultation and treatment to address issues with Conrad's hands, legs and right foot.  On July 29, 2005, Dr. Lofton completed a medical assessment form regarding Conrad's physical ability to perform work-related activities.   (Tr. 431-33).  Dr. Lofton opined that Conrad could lift only light weight, could stand and/or walk less than one hour during an eight-hour workday, and had a very minimal ability to sit either without interruption or in general during a workday.  (Tr. 432).  Dr. Lofton also opined that Conrad

could never climb, balance, stoop, crouch, kneel or crawl.  (Tr. 432).  Her medical findings to support her assessment, included: chronic cervical and lumbar pain, tenderness to touch, bilateral upper extremity pain, DVT, chronic phlebites resulting in chronic pain, numbness and swelling in her right leg, calf spasms with prolonged walking or standing, tail bone pain, and weakness and numbness in her hands. (Tr. 431-32).

Despite Dr. Lofton's assessment of Conrad's ability to function in the workplace, the ALJ stated that he did not place controlling weight on these opinions because "the record does not clearly support a residual functional capacity less than the sedentary level." (Tr. 25).  The ALJ found that Conrad has been fully evaluated by a number of specialists and the consensus of specialists indicated no significant findings to support the level of chronicity and severity of Conrad's complaints. (Tr. 25).  The ALJ also noted that Conrad was being maintained on conservative care and she had made progress with physical functioning. (Tr. 25).

Thus, the first issue for this Court to address is whether the ALJ gave the appropriate weight to the opinions of Conrad's treating, consulting, and reviewing physicians in determining Conrad's RFC.

A claimant's RFC is what he or she can do despite his or her limitations.  20 C.F.R. § 404.1545(a)(1).  Further, a claimant's RFC is a medical question.  See Lauer v. Apfel, 245 F. 3d 700, 704 (8th Cir. 2001) (citation omitted).  The ALJ must determine a claimant's RFC by considering the combination of the claimant's mental and physical impairments. See Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  In determining a claimant's RFC, the ALJ must consider all relevant evidence, including medical records, observations of treating physicians and others, and claimant's own descriptions of his or her limitations.  Id.

The ALJ "bears the primary responsibility for assessing a claimant's [RFC] based on all relevant evidence."   Roberts v. Apfel, 222 F.3d 466, 469 (8th Cir. 2000). Nonetheless, the RFC determination must be supported by "medical evidence that addresses claimant's 'ability to function in the workplace.'"  Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003) (quoting Nevland v. Apfel, 223 F.3d 853, 858 (8th Cir. 2000)).

Medical opinions are evaluated under the framework described in 20 C.F.R. § 404.1527.  In according weight to medical opinions, the ALJ should consider the following factors:  (1) the length of the treatment relationship; (2) the nature and extent of the treatment relationship; (3) the quantity of evidence in support of the opinion; (4) the consistency of the opinion with the record as a whole; and (5) whether the treating physician is also a specialist.  20 C.F.R. §404.1527(d).

A treating physician's opinion is typically entitled to controlling weight if it is well-supported by "medically acceptable clinical and laboratory and diagnostic techniques and is not inconsistent with other substantial evidence in the record."   Leckenby v. Astrue, 487 F.3d 626, 632 (8th Cir. 2007) quoting Prosch v. Apfel, 201 F.3d 1010, 1012-13 (8th Cir. 2000); 20 C.F.R. § 404.1527(d)(2).  The treating physician's continuing relationship with the claimant makes him or her especially qualified to evaluate reports from examining doctors, to integrate the medical information they provide, and to form an overall conclusion as to functional capacities and limitations, as well as to prescribe or approve the overall course of treatment. Lester v. Chater, 81 F.3d 821, 833 (9th Cir. 1996); SSR 96-5p (stating regulations recognize that treating sources are important sources of medical evidence and expert testimony, and that their opinions are entitled to special significance and sometimes the medical opinions of treating sources are entitled to controlling weight).

Even if treating physicians are not entitled to controlling weight, the regulatory framework still requires they be given significant weight. In this regard, SSR96-2p states:

> Adjudicators must remember that a finding that a treating source medical opinion is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to "controlling weight," not that the opinion should be rejected. Treating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 CFR 404.1527 and 416.927. In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight.

SSR 96-2p.

SSR 96-8p, is the Social Security Ruling that sets forth the Social Security Administration's policies and policy interpretations regarding the assessment of residual functional capacity.  In the section entitled "Narrative Discussion Requirements", it states in relevant part:

> The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudicator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) . . . , and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record. <u>The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved.</u>

> Symptoms. In all cases in which symptoms, such as pain, are alleged, the RFC assessment must:

*Contain a thorough discussion and analysis of the objective medical and other evidence, including the individual's complaints of pain and other symptoms and the adjudicator's personal observations, if appropriate;

* Include a resolution of any inconsistencies in the evidence as a whole; and

* Set forth a logical explanation of the effects of the symptoms, including pain, on the individual's ability to work.

The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.

* * *

Medical opinions. The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.

Medical opinions from treating sources about the nature and severity of an individual's impairment(s) are entitled to special significance and may be entitled to controlling weight. If a treating source's medical opinion on an issue of the nature and severity of an individual's impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the case record, the adjudicator must give it controlling weight.

SSR 96-8p (emphasis added).

Similarly, the section entitled "Explanation of the Weight Given to a Treating Source's Medical Opinion" in SSR 96-2p states:

Paragraph (d)(2) of 20 CFR 404.1527 and 416.927 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s). Therefore:

> When the determination or decision:
>
> > * is not fully favorable, e.g., is a denial; . . .
>
> > * * *
>
> the notice of the determination or decision must contain
> specific reasons for the weight given to the treating source's
> medical opinion, supported by the evidence in the case record,
> and must be sufficiently specific to make clear to any
> subsequent reviewers the weight the adjudicator gave to the
> treating source's medical opinion and the reasons for that
> weight.

SSR 96-2p (emphasis added).

Thus, the ALJ may credit other medical evaluations over a treating physician when such other opinions are supported by better or more thorough evidence. Prosch, 201 F.3d at 1013. On the other hand, the ALJ must give good reasons in his decision for the weight given to a treating source's medical opinion "on the nature and severity of an individual's impairments" (SSR 96-2p) and must "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p. "Whether the weight accorded the treating physician's opinion by the ALJ is great or small, the ALJ must give good reasons for that weighting." Holmstrom v. Massanari, 270 F.3d 715, 720 (8th Cir.2001) (citing 20 C.F.R. § 404.1527(d)(2)) (declaring "[w]e will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion."); see also Reed v. Barnhart, 399 F.3d 917 (8th Cir. 2005) (stating regulations require that the ALJ give good reasons for the weight afforded to a treating physician's evaluation).

Based on these principles, this Court finds that the decision of the ALJ to not give Dr. Lofton's opinions controlling weight, much less great weight, must be reversed.  As an initial matter, as argued by Conrad, the language used by the ALJ in his decision for not

placing controlling weight on the opinions of Dr. Lofton suggested that he did not use the correct standard for evaluating her opinions as required by the regulations and case law. The ALJ stated that he was not giving Dr. Lofton's opinions regarding Conrad's abilities to function in the workplace controlling weight because "the record does not <u>clearly support</u> a residual functional capacity less than the sedentary level."  (Tr. 25) (emphasis added). If one takes the ALJ's language at face value, then he did not apply the correct standard in deciding what weight to assign to Dr. Lofton's opinions. The test is not does the record clearly support Dr. Lofton's opinions; the test is whether her opinions are supported by acceptable clinical and laboratory diagnostic techniques and "not inconsistent" with other substantial evidence in the record. <u>Shontos v. Barnhart</u>, 328 F.3d 418, 426 (8th Cir. 2003); 20 C.F.R. § 404.1527 (d)(2).

Even if the ALJ simply made a poor choice in the words he used to describe why he was not giving Dr. Lofton's opinions controlling weight, the real flaw in the ALJ's decision to reject the severity of the limitations placed upon Conrad by Dr. Lofton, was that he failed to sufficiently state his reasons for refusing to give her opinions controlling weight, or to "explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." <u>See</u> SSR 96-2p; SSR 96-8p.  The only explanation that the ALJ gave was that "[a] consensus of specialists finds no significant findings to support the level of chronicity and severity of the claimant's complaints," and that Conrad was being maintained on conservative care and she had made progress with physical functioning. (Tr. 25). These  conclusory statements, however, do not meet the level of specificity required for rejecting a treating physician's opinions, much less "make clear to any subsequent reviewers . . . the reasons for [the] weight" given.  SSR 96-2p.  While the ALJ thoroughly summarized Conrad's medical records in his decision, and defendant laid out at length in

his brief his analysis of these medical records to support the ALJ's decision to reject Dr. Lofton's assessment of Conrad's impairments, (see Def.'s Mem., pp. 20-23), this Court, as the reviewer of the ALJ's decision, has no way of knowing if the reasons articulated by defendant were indeed the ALJ's reasons for his decision not to give Dr. Lofton's impairment opinions controlling weight.  Lacking such analysis by the ALJ, this Court is left to speculating regarding his reasons, which this Court will not do.

Having failed to satisfy the requirements for articulating with specificity the reasons for rejecting the opinions of Conrad's treating physician with respect to the severity of her impairments, the ALJ's decision must be reversed, and the case must be remanded back to the Commissioner to properly explain his decision to not give Dr. Lofton's opinions controlling weight.

**B.    Residual Functional Capacity**

An individual's residual functional capacity is derived from a comprehensive, individualized assessment of the claimant's limitations. See, e.g., Mental Health Ass'n of Minnesota v. Heckler, 720 F.2d 965, 968 (8th Cir. 1983).  An RFC assessment should include "all limits on work-related activities." SSR 85-16. It should describe "just what work-related skills and abilities a claimant has remaining after taking into account all of his or her physical and psychological limitations." Laird v. Stilwill, 969 F.Supp. 1167, 1193 (8th Cir. 1997).  It is described in the regulations as: "[y]our residual functional capacity is what you can still do despite your limitations." 20 C.F.R. § 404.1545(a) (1996).

In July 2005, Dr. Lofton assessed Conrad's physical limitations and found her unable to reach, handle and feel due to pain, weakness and numbness in her hands. (Tr. 432). Nevertheless, the ALJ determined that Conrad could perform sedentary work and that she had the RFC to lift and carry ten pounds occasionally, stand and/or walk two hours of an

eight-hour day, sit six hours of an eight-hour day and limited to unskilled work with low stress and routine tasks.  (Tr. 21, 614).  Conrad argues that the ALJ failed to address her issues with her hands. In addition, Conrad maintains that as the medical record is replete with references to the need for her to elevate her leg, the ALJ should have included that limitation in the determination of the residual functional capacity, as well.

### 1.   Opinions Regarding Hands

The ALJ found that Conrad was limited to sedentary work. (Tr. 21). SSR 96-9p sets forth the Social Security Administration's policies regarding the impact of an RFC assessment for less than a full range of sedentary work on an individual's ability to do other work.  In the section entitled "Manipulative limitations" the ruling stated:

> Most unskilled sedentary jobs require good use of both hands and the fingers; i.e., bilateral manual dexterity. Fine movements of small objects require use of the fingers; e.g., to pick or pinch. Most unskilled sedentary jobs require good use of the hands and fingers for repetitive hand-finger actions.

SSR 96-9p.

With respect to use of her hands, it is Conrad's contention that Dr. Lofton's opinions are supported by the record and that the ALJ failed to take them into account in his determination that she could perform sedentary work and in the hypothetical he posed to the VE.

In 2003, Conrad exhibited continued symptoms of carpal tunnel and she underwent carpal tunnel release and partial tensosynovectomy on her left hand. (Tr. 321). In August 2004, Dr. Lofton noted enlargement of the PIP joints and limited functions on the right hand. (Tr. 464).  Throughout the latter part of 2004, Conrad reported to her doctors pain, stiffness and soreness in her hands and that she had difficulty putting on compression stockings due to the stiffness and swelling in her hands, and the doctors' reports reflected objective

findings and diagnoses with respect to these complaints.  (Tr. 357, 359, 379, 388, 422, 457, 461).

In response to questions by Conrad's attorney, the VE described the job requirements for the three positions that he indicated Conrad could perform in light of the RFC determined by the ALJ.  With respect to the job of sorter, DOT 734.687-082, he stated that a job sorter "examines pearl or plastic button blanks on moving conveyor and dispatch or discards those with defects such as worm holes and spots, loose spots, uneven backs, cracks or chips." (Tr. 616).  DOT 734.687-082 sets out the following levels of functioning needed for the sorter position:

> Finger Dexterity: Level 3 - Middle 1/3 of the Population
> Medium Degree of Aptitude Ability
>
> Manual Dexterity: Level 3 - Middle 1/3 of the Population
> Medium Degree of Aptitude Ability
>
> Reaching: Constantly - Exists 2/3 or more of the time
>
> Handling: Constantly - Exists 2/3 or more of the time
>
> Fingering: Constantly - Exists 2/3 or more of the time

Dictionary of Occupational Titles (*4th Ed, Rev. 1991*), 1991 WL 679966.

For the job of inspector/cuff folder, DOT 685.687-014, the VE stated that this position "pulls cuffs preparatory to sewing cuffs or sleeves off garments. Lays cuffs flat on table and folds cuff in half." (Tr. 616). DOT 734.687-082 sets out the following levels of functioning needed for the position of cuff folder:

> Finger Dexterity: Level 3 - Middle 1/3 of the Population
> Medium Degree of Aptitude Ability
>
> Manual Dexterity: Level 4 - Lowest 1/3 Excluding Bottom 10%
> Low Degree of Aptitude Ability
>
> Reaching: Frequently - Exists from 1/3 to 2/3 of the time

Handling: Frequently - Exists from 1/3 to 2/3 of the time

Fingering: Frequently - Exists from 1/3 to 2/3 of the time

Dictionary of Occupational Titles  (4*th* Ed, Rev. 1991), 1991 WL 678284.

For the job of polisher, the VE  stated the person performing this job "smooths and polishes jewelry such as charms, earrings, pins, rings and bracelets using polishing wheel." (Tr. 616).  DOT 700.687-058 provides the following level of functioning for this position:

Finger Dexterity: Level 3 - Middle 1/3 of the Population
Medium Degree of Aptitude Ability

Manual Dexterity: Level 3 - Middle 1/3 of the Population
Medium Degree of Aptitude Ability

Reaching: Frequently - Exists from 1/3 to 2/3 of the time

Handling: Frequently - Exists from 1/3 to 2/3 of the time

Fingering: Frequently - Exists from 1/3 to 2/3 of the time

Dictionary of Occupational Titles  (4*th* Ed, Rev. 1991), 1991 WL 678936.

Based on these jobs descriptions, this Court finds that the decision of the ALJ must be reversed. Both SSR 96-9p and the DOT's descriptions of the types of jobs that the VE testified Conrad could perform assume a certain level of use of a claimant's hands and fingers.  Dr. Lofton, opined that Conrad was unable to reach, handle and feel due to pain, numbness and weakness in her hands.  Yet, the ALJ failed to explain why he did not include any limitations on Conrad's ability to use her hands.

Again, while defendant laid out numerous reasons the ALJ may have had for not including any limitations in his RFC finding, (Def.'s Mem., pp. 24-25), the decision must be reversed because it was incumbent upon the ALJ to address these alleged impairments one way or another in his decision. Either he should have included them in the RFC and hypothetical he posed to the VE, or give his reasons with specificity for not accepting

Dr. Lofton's opinions regarding these functional impairments. A vocational expert's testimony that does not encompass all relevant impairments and "capture the concrete consequences of those impairments" does not constitute substantial evidence. Hillier v. Social Sec. Admin, 486 F.3d 359, 365 (8th Cir. 2007).  A remand is necessary for the ALJ to reassess Conrad's limitations on her hands, determine the RFC in light of this assessment and if necessary, pose a different hypothetical to the vocational expert. Alternatively, the ALJ must explain why any impairments with respect to Conrad's hands are not included in the RFC for Conrad.

### 2.   Opinions Regarding Legs

Conrad also maintains that the ALJ should have included the need for her to elevate her leg periodically in the determination of her RFC. In opposition, defendant argues that while Conrad summarizes at length the medical evidence relating to her foot and legs, no treating physician, including Dr. Lofton, indicated that Conrad needed to elevate her leg during the workday.  See Def.'s Mem., pp. 25-26.  Defendant also points out that the record indicates that Conrad experienced swelling when she engaged in prolonged periods of standing, which is not a requirement for the performance of sedentary work. Id., p. 26.  The Court agrees. No treating physician indicated that elevation of her during the day was required.  Further, the ALJ not only considered all of the issues that Conrad was having with her legs, the Court finds that by determining that she could perform sedentary work[24] and limiting her standing and/or walking two hours of an eight-hour day, and sitting six hours of an eight-hour day, he addressed the issues of swelling she experiences when she was on

---

[24]     The DOT indicates states that "[s]Sedentary work involves sitting most of the time, but may involve walking or standing for brief periods of time. Jobs are sedentary if walking and standing are required only occasionally and all other sedentary criteria are met."  DOT  (4th Ed, Rev. 1991), Appendix C.

her feet for length periods of time.

**C.   Conclusion**

The ALJ erred by not stating in detail his reasoning for finding that the treating physician's opinion is not entitled to controlling weight. In addition, he failed to address the impairments Dr. Lofton placed on Conrad's ability to reach, handle and feel, by either including them in the RFC and the hypothetical he posed to the VE, or by stating his reasons with specificity for not accepting Dr. Lofton's opinions regarding these functional impairments. Consequently, the ALJ must fulfill his responsibility to fully develop and explain the record in the manner prescribed by the SSA Regulations and Eighth Circuit case law.

Therefore, it is recommended that Conrad's motion for summary judgment be granted in part and denied in part.  Conrad's request for an immediate award of benefits should be denied.  However, the ALJ's decision should be vacated.  It is also recommended that the defendant's motion for summary judgment be denied, and that this case be remanded for further administrative proceedings.   On remand, the ALJ should be directed to do the following:

First, the ALJ should give full consideration to the opinions of Dr. Lofton in determining Conrad's RFC, including her opinions regarding Conrad's use of her hands and fingers.

Second, after giving full consideration to the opinions of Dr. Lofton, if the ALJ does not believe that they provide an accurate, current and reliable basis for determining Conrad's RFC, then he shall fully explain his position on those matters in light of the record.

Third, if the ALJ revises his final RFC determination, he should solicit new testimony from a vocational expert in order to determine whether, at step five of the evaluation process, there are any jobs that Conrad could perform given the ALJ's post-remand RFC

determination. <u>See Jenkins v. Apfel</u>, 196 F.2d 922, 925 (8th Cir. 1999) (where a vocational expert's opinion is predicated on a faulty RFC determination, the ALJ cannot rely on that opinion).

## VI.   RECOMMENDATION

For the reasons set forth above, this Court finds that the decision by the ALJ to deny plaintiff disability benefits is not supported by substantial evidence on the record as a whole.

THEREFORE, IT IS RECOMMENDED THAT:

1.   Plaintiff's Motion for Summary Judgment [Docket No. 11] be granted in part, and denied in part;

2.   Defendant's Motion for Summary Judgment [Docket No. 14] be denied; and

3.   The decision of the Administrative Law Judge be vacated and the case be remanded to the Commissioner for further proceedings consistent with this Report and Recommendation.

Dated:        February 19, 2008

*s/ Janie S. Mayeron*
JANIE S. MAYERON
United States Magistrate Judge

Pursuant to Local Rule 72.1(c)(2), any party may object to this Report and Recommendation by filing with the Clerk of Court, and by serving upon all parties, written objections which specifically identify the portions of the Report to which objections are made and the bases for each objection.  This Report and Recommendation does not constitute an order or judgment from the District Court and it is therefore not directly appealable to the Circuit Court of Appeals.  Written objections must be filed with the Court before **March 3, 2008.**